FILED

2014 JUN 18  AM 10 01

U.S. DISTRICT COURT
NEW HAVEN, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MONJASA DMCC,<br><br>                              Plaintiff,<br><br>        -against-<br><br>M/V OCEAN TOMO, her tackle, engines, etc. *in rem*,<br><br>                              Defendant. | 14 cv _____<br><br>**VERIFIED COMPLAINT** |

   Plaintiff, MONJASA DMCC ("Plaintiff" or "Monjasa"), by its attorneys, Blank Rome LLP, complaining of the above-named defendant, alleges:

   1.   This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

   2.   At all material times, Plaintiff Monjasa DMCC ("Monjasa") was and now is a company organized and existing under the laws of the United Arab Emirates with an office and place of business at Jumeirah Lake Tower, AG Tower, Office No 35 JKL, Dubai, UAE.

   3.   Defendant M/V OCEAN TOMO (the "Vessel") was and is an ocean going cargo vessel (IMO No. 9478808), which is, upon information and belief, owned by Lua Line/Okino Kaiun. On information and belief, Lua Line/Okino Kaiun is a company organized and existing under the laws of the Philippines, as indicated by the Equasis Vessel Summary attached to this Verified Complaint as Exhibit A and incorporated herein by reference.

4. At the time the debt was incurred, as described in greater detail below, the Vessel was time chartered to Egyptian Bulk Carriers Co. ("Time-Charterer"), which upon information and belief is a company organized and existing under the laws of Egypt.

## VENUE AND JURISDICTION

5. The Court has *in rem* jurisdiction over the Vessel because it is currently within this jurisdiction or is expected to be in this district during the pendency of this action.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## THE FACTS

8. Plaintiff is an international supplier of fuel oil (also known as "bunkers") to ships and other vessels.

9. On or about November 23, 2013, at the request of Time-Charterer, Plaintiff sold and delivered to the Vessel 605.026 metric tons of IFO-380cst RMG380-3.5 and 22.019 metric tons of MGO DMA 0.1 bunker fuel (the "Fuel"), as set forth in the November 15, 2013 Monjasa Bunker Confirmation ("the Bunker Confirmation") and various delivery receipts, copies of which are attached to this Verified Complaint as Exhibit B and incorporated herein by reference. The Time-Charterer was authorized to purchase the Fuel for the Vessel, and the Fuel was consumed by the Vessel. The entire transaction was subject to Plaintiff's General Terms and Conditions, attached to this Verified Complaint as Exhibit C and incorporated herein by reference, which Terms and Conditions were expressly referenced in the Bunker Confirmation. The Terms and Conditions expressly note that the Fuel sales contract is governed by the law of the United States.

10. The purchase price for the Fuel was $399,719.87, as noted in Monjasa Invoice AE27825 ("Invoice"), a copy of which is attached to this Verified Complaint as Exhibit D and

incorporated herein by reference. Also as noted in the Invoice, payment for the Fuel was due no later than December 21, 2013.

11. As of the date of filing this Verified Complaint, no part of the outstanding amount due under the Invoice has been paid although duly demanded.

12. The non-payment for the Fuel constitutes a breach of the terms by which Plaintiff furnished the Fuel to the Vessel.

13. As set forth in Exhibits C and D, Plaintiff's Invoice provides that interest will accrue on all unpaid balances at the rate of 2% per month, with interest calculated for each overdue day. The total interest due as of June 12, 2014 is $45,568.07, as calculated on Exhibit E attached to this Verified Complaint and incorporated herein by reference.

14. By virtue of Plaintiff's furnishing of "necessaries" to the Vessel within the meaning of the Federal Maritime Lien Act, 46 U.S.C. § 31342 et seq., on the order of the Time-Charterer, Plaintiff has a maritime lien *in rem* against the Vessel for the full amount of its claim.

15. Under the federal maritime law and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, Plaintiff is entitled to arrest the Vessel to enforce its maritime lien.

16. Plaintiff previously arrested the Vessel in Rotterdam in May 2014, but under Dutch law such an arrest is only allowed in order to secure an *in personam* claim, as opposed to proceeding as an *in rem* claim against the ship. Security was provided for the *in personam* claim by the current time charterers of the Vessel, MOL Bulk Carriers Pte. Ltd. ("MOLBC"). Plaintiff has determined it will be difficult to recover on an *in personam* claim against MOLBC and therefore is prepared to voluntarily dismiss the Dutch proceedings immediately and fully return MOLBC's security upon successful arrest of the Vessel in connection with this action.

17. The *in personam* claim in Rotterdam is separate and distinct from the *in rem* action against the Vessel now pending before this Court. So as to avoid the possibility of "double security," should this Court authorize arrest of the Vessel and the Vessel accordingly be arrested in this action, Plaintiff represents that it will thereafter promptly file its request for dismissal of the proceedings in Rotterdam, such request to include immediate release of the security posted by MOLBC in those proceedings.

**WHEREFORE**, Plaintiff prays:

A. That Plaintiff have judgment in the amount of **$445,287.94**, representing the total principal owed and the accrued interest through June 12, 2014, together with interest continuing to accrue at the rate of 2% per month until the amount owing is paid in full, and together with Plaintiff's costs and disbursements incurred herein, including costs of *custodia legis*; and

B. That process *in rem*, the Verified Complaint and Warrant for Arrest, pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims be issued against Defendant M/V OCEAN TOMO, her tackle, engines, etc., and served upon the Master or other ranking officer or caretaker of the Vessel, placing the Vessel under the arrest, custody and control of the Marshal of this district;

C. That the Defendant M/V OCEAN TOMO, her tackle, engines, apparel, furniture and equipment and all other appurtenances and additions, improvements, and replacements belonging thereto, be condemned and sold to pay the judgment entered herein, including interest then accrued and all costs and disbursements due Plaintiff herein, including costs of *custodia legis*;

D. That Plaintiff may have such other and further relief as the Court deems just and proper.

DATED this 18th day of June, 2014.

BLANK ROME LLP

/s/ Thomas H. Belknap

Thomas H. Belknap
Federal Bar No.: CT17966
tbelknap@blankrome.com
Phone: (212) 885-5000
Fax: (917) 332-3734

*Attorneys for Plaintiff MONJASA DMCC*

## VERIFICATION

I, Thomas H. Belknap state as follows:

1. I have been admitted to practice as an attorney in the state of Connecticut and before this Court since 1997 and am a partner in the firm of Blank Rome LLP, attorneys for Plaintiff.

2. I have read the foregoing Verified Complaint and I believe the contents thereof are true.

3. The reason this Verification is made by counsel and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction, and the circumstances of needing an immediate arrest of the Vessel before it leaves this jurisdiction make obtaining a Verification directly from Plaintiff impractical.

4. The sources of my information and belief as to the truth of the allegations of this Verified Complaint are documents attached to this Verified Complaint as Exhibits and communications from representatives of Plaintiff, specifically with respect to the Dutch proceedings referenced in the Verified Complaint and Plaintiff's intentions with respect to those proceedings.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Thomas H. Belknap

130916.00632/7400903v.1



# Equasis - Ship folder
# OCEAN TOMO
*imo: 9478808*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
- Bulk-downloading of data contained on the site ;
- Use of downloaded data for financial gain ;
- Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

## Ship informations

### • Ship particulars

|  | Information | Since |
|---|---|---|
| IMO number : | 9478808 |  |
| Name of ship : | OCEAN TOMO | (since 01/09/2010) |
| Call sign : | 3FID9 |  |
| MMSI : | 372951000 |  |
| Gross tonnage : | 31243 | (since 01/09/2010) |
| DWT : | 55621 |  |
| Type of ship : | Bulk Carrier | (since 01/10/2010) |
| Year of build : | 2010 |  |
| Flag : | Panama | (since 01/09/2010) |
| Status of ship : | In Service/Commission | (since 08/09/2010) |
| Last update : | 20/05/2014 |  |

## • Management detail

| IMO | Role | Name of company | Address | Date of effect |
|---|---|---|---|---|
| 0640785 | Ship manager | WORLD MARINE CO LTD | 8th Floor, Kanpai Building, 22-27, Higashigotanda 5-chome, Shinagawa-ku, Tokyo-to, 141-0022, Japan. | since 08/12/2010 |
| 5498875 | Registered owner | LUA LINE/OKINO KAIUN | Care of Leo Ship Management Inc , 2rd Floor, Metro Bank Building, 900, President Quirino Avenue & Corner of Leon Guinto Street, Malate, 1004 Manila, Philippines. | since 08/12/2010 |
| 0640785 | ISM Manager | WORLD MARINE CO LTD | 8th Floor, Kanpai Building, 22-27, Higashigotanda 5-chome, Shinagawa-ku, Tokyo-to, 141-0022, Japan. | since 08/09/2010 |

## • Classification status

| Classification society | Date change status | Status | Reason |
|---|---|---|---|
| Nippon Kaiji Kyokai | since 08/09/2010 | Delivered | |

## • Classification surveys

| Classification society | Date survey | Date next survey |
|---|---|---|
| Nippon Kaiji Kyokai | 08/09/2010 | 07/09/2015 |

## • Safety management certificate

| Classification society | Date survey | Date expiry | Date of status | Status | Reason | Type |
|---|---|---|---|---|---|---|
| Nippon Kaiji Kyokai | 21/02/2011 | 20/02/2016 | 21/02/2011 | Delivered | | Convention |

## • P&I information

| Name of P&I insurer | Recorded on |
|---|---|
| Japan Ship Owners' P&I Association | 21/05/2014 |

# Ship inspections

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| Paris MoU | Denmark | Aarhus | 25/03/2014 | N | 0 | 6 |
| Vina Del Mar MoU | Brazil | SAO FRANCISCO DO SUL SC | 11/10/2013 | N | 0 | 3 |
| Vina Del Mar MoU | Brazil | SAO FRANCISCO DO SUL SC | 10/10/2013 | N | 0 | 3 |
| Paris MoU | Canada | Vancouver | 22/04/2013 | N | 0 | 4 |
| Tokyo MoU | Japan | Yokkaichi | 25/03/2013 | | | |
| Paris MoU | Belgium | Ghent | 27/03/2012 | N | 0 | 3 |
| US Coast Guard | United States of America | New Orleans, Louisiana | 04/02/2012 | N | 0 | |
| Vina Del Mar MoU | Brazil | IMBITUBA SC | 28/11/2011 | N | 0 | |
| Paris MoU | Netherlands | Rotterdam | 17/02/2011 | N | 0 | |
| US Coast Guard | United States of America | Savannah, Georgia | 06/11/2010 | N | 0 | |
| Tokyo MoU | | | 17/09/2010 | | | |

## • Human element deficiencies

| PSC organisation | Authority | Port of inspection | Date of report | Human element deficiencies |
|---|---|---|---|---|
| Vina Del Mar MoU | Brazil | SAO FRANCISCO DO SUL SC | 11/10/2013 | 1 |
| Vina Del Mar MoU | Brazil | SAO FRANCISCO DO SUL SC | 10/10/2013 | 1 |

# Ship history

## • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| OCEAN TOMO | since 01/09/2010 | IHS Maritime |

## • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| Panama | since 01/09/2010 | IHS Maritime |

## • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Nippon Kaiji Kyokai | 08/09/2010 | Nippon Kaiji Kyokai |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| LUA LINE/OKINO KAIUN | Registered owner | since 08/12/2010 | IHS Maritime |
| WORLD MARINE CO LTD | Ship manager | since 08/12/2010 | IHS Maritime |
| CLIO MARINE INC | Ship manager | since 08/09/2010 | IHS Maritime |
| CLIO MARINE INC | Registered owner | since 08/09/2010 | IHS Maritime |
| WORLD MARINE CO LTD | ISM Manager | since 08/09/2010 | IHS Maritime |



Bunkering knowledge

## BUNKER CONFIRMATION
### No AE108665

To : Egyptian Bulk Carriers Co     Date 15-11-2013
**Att** : **Hany Habib**

With reference to our correspondance, we hereby confirm your order as follows:

Vessel          : OCEAN TOMO (call sign: 3FID9 / imo: 9478808)
Port            : Gibraltar
Delivery Date   : 23-11-2013

For Account : m/v OCEAN TOMO master and/or owners and/or charterers and/or managers and/or operators and/or Egyptian Bulk Carriers Co

Details :

| **Product** | **Quantity** | | **Price/Unit** |
|---|---|---|---|
| lfo-380cst RMG380 3,5% | 605 Mts | USD | 625,00 / Mts.fob |
| MGO DMA 0,1% | 22 Mts | USD | 980,00 / Mts.fob |

Payment : 30 days from delivery date

Agent   : A. Mateos & Sons Ltd - Gibralt | Tel: 00350 200 71241

Monjasa Group Terms & Conditions Jan. 2012 to apply. Copy available on our website: www.monjasa.com

We thank you for your support

Best regards,

**Monjasa DMCC**
Malek Mostapha

| | |
|---|---|
| Direct Email | mmo@monjasa.com |
| Direct Phone | +971 4 420 8610 |
| Mobile Phone | +971 56 644 7401 |
| Yahoo Msg | mmo_monjasa |
| MSN Msg | |

---

Monjasa DMCC                                  Phone : +971 4 420 8600
Jumeirah Lake Tower, AG Tower, Office No 35 JKL   Fax   : +971 4 432 8637
Dubai, UAE                                    Email : dubai@monjasa.com

**BUNKER DELIVERY RECEIPT**

DATE OF ISSUE: 23/11/2013
VESSEL: OCEAN TOMO
IMO: 9478808
PORT: GIBRALTAR
DELIVERY DATE: 23/11/2013
CUSTOMER: _____

| GRADE | ENVIR. QUANTITY KGMS | LTRS | LTRS AT 15°C | BILLING QUANTITY M.T | DENSITY AT 15°C |
|---|---|---|---|---|---|
| HSFO 380 CST | | | | 605.026 MT | 0.9883 |
| SULPHUR (% m/m) 2.29 | | | | | OBSERVED TEMPERATURE 40 °C |

Quantity (written in full): SIX ZERO FIVE DEC ZERO TWO SIX MT

PUMPING HRS: 2H 30 MIN
STARTED 23/11/2013 15:50
FINISHED 23/11/2013 18:20

METHOD OF DELIVERY: BARGE — AEGEAN PRINCESS

AEGEAN BUNKERING (GIB) LTD
FOR ACCOUNT AEGEAN MARINE PETROLEUM S.A.

RECEIVING VESSEL
VESSEL'S SEAL
CAPTAIN
AND/OR
CHIEF ENGINEER

REMARKS
SAMPLE SEAL NUMBERS
MARPOL VSL: GT...
VESSEL: GT...
BARGE: GT...

**BUNKER DELIVERY RECEIPT**

DATE OF ISSUE: 23/11/2013
VESSEL: OCEAN TOMO
IMO: 9478808
PORT: GIBRALTAR
DELIVERY DATE: 23/11/2013
CUSTOMER: _____

| GRADE | ENVIR. QUANTITY KGMS | LTRS | LTRS AT 15°C | BILLING QUANTITY M.T. | DENSITY AT 15°C |
|---|---|---|---|---|---|
| MGO | | | | 22.019 MT | 0.8880 |
| SULPHUR (% m/m) 0.09% | | | | | OBSERVED TEMPERATURE 22 °C |

Quantity (written in full): TWO TWO DEC ZERO ONE NINE

| PUMPING HRS  1.5 MIN | METHOD OF DELIVERY | |
|---|---|---|
| STARTED 23/11/2013  1505 | BARGE  AEGEAN PRINCESS | EX-PIPE |
| FINISHED 23/11/2013  1520 | | |

| AEGEAN BUNKERING (GIB) LTD FOR ACCOUNT AEGEAN MARINE PETROLEUM S.A. | RECEIVING VESSEL | REMARKS |
|---|---|---|
| [signature] | VESSEL'S SEAL  CAPTAIN  AND/OR  [signature]  CHIEF ENGINEER | SAMPLE SEAL NUMBERS: MARPOL VSL: G6717... VESSEL: G6717... BARGE: G6717... |

# General Terms and Conditions
Monjasa Group

**Preamble**
These General Terms and Conditions shall apply to all deliveries contracted for unless the Sellers expressly confirm otherwise in the Bunker Confirmation. Each delivery shall constitute a separate contract.

### 1. Definitions
Throughout this Contract, except where the context otherwise requires, the following definitions shall be applied:
"*Marine Fuels*" means products, derived from crude oil, delivered or to be delivered to the Vessel.
"*Sellers*" means the party contracting to sell and deliver Marine Fuels, and
"*Buyers*" means the party contracting to purchase, take delivery and pay for the Marine Fuels.
"*Bunker Tanker*" means bunker barge or tanker or tank truck supplying Marine Fuels to the Vessel.

### 2. Grades/Quality
a) The Buyers shall have the sole responsibility for the nomination of the grades of Marine Fuels fit for use by the Vessel.

b) The Sellers warrant that the Marine Fuels shall be of a homogeneous and stable nature, shall comply with the grades nominated by the Buyers and be of a quality widely accepted in the industry. Unless otherwise agreed in the Bunker Confirmation, the Marine Fuels will comply with ISO Standard 8217 (E):2005

### 3. Quantities/Measurements
a) Subject to the provisions of sub-clause 6(c) and Clause 9 hereunder the quantities of Marine Fuels delivered shall be determined from the official gauge or meter of the Bunker Tanker effecting delivery, or in case of delivery ex wharf, of the shore-meter.

b) The Buyers and the Sellers shall both have the right to be present or represented when such measurements are taken and shall be given sufficient information and access to the official gauge or meter of the Bunker Tanker or shore-meter and relevant documentation to verify the volume delivered.

c) The Marine Fuels to be delivered under this Contract shall be measured and calculated in accordance with the ISO-ASTM-API-IP Petroleum Measurement Tables.

### 4. Sampling
a) The Sellers shall arrange for a representative sample of each grade of Marine Fuels to be drawn throughout the entire bunkering operation and that sample shall be thoroughly mixed and carefully divided into four (4) identical samples. The sampling shall be performed in the presence of both the Sellers and the Buyers or their respective representatives. The absence of the Buyers or their representatives shall not prejudice the validity of the samples taken.

b) The sample shall be drawn at a point, to be mutually agreed between the Sellers and the Buyers or their respective representatives, closest possible to the Bunker Tanker manifold.

c) The sample shall be drawn using a mutually accepted sampling device which shall be constructed, secured and sealed in such a way so as to prevent the sampling device and the sample being tampered with throughout the transfer period.

d) The four (4) identical samples referred to in subclause 4(a) shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and point of sampling and seal number, authenticated with the Vessel's stamp and signed by the Sellers' representative and the Master of the Vessel or his authorised representative.

e) Two (2) samples shall be retained by the Sellers for minimum forty five (45) days after delivery of the Marine Fuels to the Vessel or, on being requested in writing by the Buyers, for as long as the Buyers may reasonably require, and the other two (2) samples shall be retained by the Vessel.

f) If the quantity is delivered by more than one Bunker Tanker, the sampling procedure shall be repeated as outlined in this Clause 4.

g) In the event of a dispute relating to the quality of the marine fuel supplied, the samples drawn by the Bunker Tanker only under this clause shall be conclusive and only the results of testing of samples drawn under this section shall be admissible in any proceedings to prove the quality of the marine fuel provided.

### 5. Delivery
a) Delivery of the Marine Fuels shall be made day and night, Sundays and holidays included, at the port or place of delivery, subject always to the custom of that port or place.

b) Buyers shall at the time the order is placed designate a date or range of dates for delivery of the Marine Fuels, which dates will be confirmed in the Bunker Confirmation for delivery of the Marine Fuels.

  i) In the event the vessel arrives earlier than 24 hours prior to the agreed date or range of dates or later than 24 hours after the agreed date or range of dates, Buyer agrees to an adjustment in price to reflect any increase in the relevant Platts publications, which may be obtained from the Seller upon request.

Monjasa Group
Strevelinsvej 34
DK-7000 Fredericia
www.monjasa.com

Tel: +45 70 260 230
Fax: +45 70 230 233
denmark@monjasa.com


Page 1 of 5

    ii) Should Buyer elect to cancel the order, Buyer shall pay a cancellation fee equal to 5 % of the order price.

c) The Buyers, or their agents at the port or place of delivery, shall give the Sellers or their representatives at the port or place of delivery, 72 and 48 hours approximate and 24 hours definite notice of the Vessel's arrival and the location and time at which deliveries are required.

d) The Sellers shall:

    i) be in possession of all permits required to comply with all relevant regulations pertaining to delivery of Marine Fuels at the port or place of delivery, and;

    ii) subject to local laws, render all necessary assistance which may be reasonably required to make connections and disconnections between the delivery hose(s) and the Vessel's bunker manifold.

e) The Buyers shall be responsible for making all connections and disconnections between the delivery hose(s) and the Vessel's bunker manifold and to ensure that the hose(s) are properly connected to the Vessel's bunker manifold prior to the commencement of delivery.

f) Seller shall have no responsibility for detention or demurrage incurred by Buyer or to Buyer's Vessel caused by delays in the Bunker Tanker arriving on station due to bad weather or bad visibility.

g) The Buyers shall ensure that the Vessel is in possession of all certificates required to comply with all relevant regulations pertaining to delivery of the Marine Fuels at the port or place of delivery and that the Master of the Vessel shall:

    i) advise the Sellers in writing, prior to delivery, of the maximum allowable pumping rate and pressure and agree on communication and emergency shut-down procedures;

    ii) notify the Sellers in writing prior to delivery, of any special conditions, difficulties, peculiarities, deficiencies or defects in respect of and particular to the Vessel which might adversely affect the delivery of the Marine Fuels, and;

    iii) provide a free side to receive the Marine Fuels and render all necessary assistance which may reasonably be required to moor or unmoor the Bunker Tanker, as applicable.

### 6. Documentation

a) Before commencement of delivery the Sellers shall without obligation endeavour to present a bunker requisition form or similar document, duly signed by the Sellers or their representative, which shall contain the quantities to be delivered and all information required in accordance with the Bunker Confirmation or any subsequent amendments thereof, including, in particular, the values for:

- viscosity
- density
- sulphur content
- flash point

In addition, and if available, similar information shall be provided for vanadium, ash content, water content and pour point.

b) Once the delivery is completed and quantities measured, a receipt shall be signed and stamped by the Master of the Vessel or his authorised representative, and returned to the Sellers, or their representative, as acknowledgement of the actual volume only and a duplicate copy shall be retained by the Master of the Vessel. This receipt shall contain the following minimum information which is warranted by the Sellers:

- delivered quantity in volume units
- density in kg/m3 at 15o C as per ISO 3675
- flash point
- sulphur content in % m/m as per ISO 8754
- viscosity

c) In the event the Master of the Vessel is not satisfied with the sampling, quality, quantity or any other matter concerning the Marine Fuels or their delivery, he shall take immediate phone contact to Seller's 24/7 phone number stated in the lower right footer of the Bunker Confirmation or to Buyer, whom must take immediate action on the complaints to solve the issue raised by the Master of the Vessel. Verification of the information provided under sub-clause 6(b) may later be obtained by analysis of the Vessel's retained sample.

d) Buyer warrants that it is authorized by the Vessel's owners/operators to order the marine fuels delivered to the Vessel and that it has provided a copy of these terms and conditions to the Vessel's owner and/or Master.

e) Buyer further warrants that by receiving the marine fuel and signing the Bunker Receipt, the Master acknowledges the vessel is bound by the terms and conditions contained herein.

### 7. Price

a) The price of the Marine Fuels shall be in the amount expressed per unit and in the currency stated in the Bunker Confirmation for each grade of Marine Fuels delivered into the Vessel's tanks free delivered/ex wharf as applicable and stated in the Bunker Confirmation. In the event the price is quoted in volume units, conversion to standard volume shall be at 60 degrees Fahrenheit or at fifteen (15) degrees Celsius.

b) Any and all additional charges, if applicable, shall be specified in the Sellers' quotation and in the Bunker Confirmation and shall include but not be limited to:

    i) Wharfage charges, barging charges or other similar charges;

    ii) Mooring charges or port dues incurred by the Sellers which are for Buyers' account, and;



Monjasa Group
Strevelinsvej 34
DK-7000 Fredericia
www.monjasa.com

Tel: +45 70 260 230
Fax: +45 70 230 233
denmark@monjasa.com



Page 2 of 5



General Terms and Conditions
Monjasa Group

iii) Duties, taxes, charges or other costs in the country where delivery takes place, for which the Sellers are accountable but which are for the Buyers' account.

## 8. Payment

a) Payment for the Marine Fuels shall be made by the Buyers as per stated in the Bunker Confirmation, after the completion of delivery. In the event payment has been made in advance of delivery, same shall be adjusted on the basis of the actual quantities of Marine Fuels delivered and additional payment and/or refund shall be made within thirty (30) days after the completion of delivery. Should the Buyer appear to be in financial difficulty or unable to meet its obligations to other creditors as they become due, Seller on written notice to Buyer may accelerate the payment date hereunder in which case payment is immediately due. In consideration of this acceleration, Buyer is entitled to a credit against the principal amount due of 2% per month (prorated over the 30 days) for every day the payment is early.

b) Payment shall be made in full, without set-off, counterclaim, deduction and/or discount, free of bank charges.

c) Payment shall be deemed to have been made on the date the payment is credited to the counter of the bank designated by the Sellers. If payment falls on a non-business day, then payment shall be made on or before the business day nearest to the due date. If the preceding and succeeding business day are equally near to the due date, then payment shall be made on or before the preceding business day.

d) Any delay in payment and/or refund shall entitle either party to interest at the rate of two (2) per cent. per month or any part thereof. Any payments made by Buyer and received by Seller shall be credited first against any interest owed under this section after which the balance of the payment, if any, shall be credited against the principal debt.

e) In the event of non-payment, the Sellers reserve the right to pursue all legal remedies available to recover the amount owed. The Sellers shall have a maritime lien on the vessel identified by it's IMO number until payment and interest has been received by the Sellers. 'No-Lien-Stamps' or -remarks in any form or wording on Bunker Delivery Receipt(s) shall be invalid and of no effect, and shall in no way impair Seller's lien or discharge the vessel's responsibility for debts under this agreement.

## 9. Claims

a) Quantity Claims:

i) The Bunker Tanker's measurements of the quantity delivered to Buyer shall be presumed accurate, and shall be final and binding on Buyer absent proof by Buyer that the measurements were inaccurately performed, calculated or recorded. Buyer's Vessel's measurements alone are insufficient to rebut this presumption.

ii) Any dispute as to the accuracy of the measurements of the quantity delivered must be notified by phone to Sellers on their 24/7 number stated in the lower right footer of the Bunker Confirmation at the time of delivery and before signing the delivery receipt or a letter of protest. Any claim as to short delivery shall be presented by the Buyers in writing within (24) hours from the time of delivery together with all documents supporting Buyer's claim, failing which any such claim shall be waived and barred.

iii) The Buyers shall be charged for all proven additional expenses incurred by the Sellers in connection with the Buyers' failure to take delivery of the full quantity of the Marine Fuels ordered by the Buyers.

b) Quality Claims:

i) Any claim as to the quality of the Marine Fuels must be notified in writing promptly after the circumstances giving rise to such claim have been discovered. If the Buyers do not notify the Sellers of any such claim within fifteen (15) days of the date of delivery, such claim shall be deemed to be waived and barred.

ii) In the event a claim is raised pursuant to sub-clause 9(b)(i), the parties hereto shall have the quality of the Marine Fuels analysed by a mutually agreed, qualified and independent international recognized laboratory. The Sellers shall suggest minimum 2 (two) such laboratories, and Buyer shall choose one laboratory for a final and binding test. The Sellers shall provide the laboratory with one of the samples retained by them as per sub-clause 4(e). The analysis shall be established by tests in accordance with those specified under ISO Standard 8217(E):2005 or equivalent. Unless otherwise agreed the expenses of the analysis shall be for the account of the party whose claim is found wrong by the analysis.

c) Delay Claims:

In the event of any delay resulting from:

i) the Buyers' failure to give proper notices and/or to comply with the notices given pursuant to sub-clause 5(c) and/or the Buyers' Vessel failing to receive Marine Fuels at the pumping rate referred to in sub-clause 5(g)(i) or;

ii) the Sellers' failure to commence delivery of the Marine Fuels promptly in accordance with the Buyers' required delivery time as notified pursuant to sub-clause 5(c), except as provided in clause 5(f), and/or the Sellers' failure to deliver the Marine Fuels in accordance with the minimum hourly pumping rate referred to in the Bunker Confirmation,

then the party suffering such delay shall be entitled to compensation from the other party for such delay.


Monjasa Group
Strevelinsvej 34
DK-7000 Fredericia
www.monjasa.com

Tel: +45 70 260 230
Fax: +45 70 230 233
denmark@monjasa.com





General Terms and Conditions
Monjasa Group

d) Neither party hereto shall be liable for indirect or consequential loss and/or damage arising from this Contract.

## 10. Risk/Title

Risk of the Marine Fuels shall pass to the Buyers once the Marine Fuels have passed the Sellers' flange connecting the Vessel's bunker manifold with the delivery facilities provided by the Sellers. Title to the Marine Fuels shall pass to the Buyers upon payment for the value of the Marine Fuels delivered, pursuant to the terms of Clause 8 hereof. Until such time as payment is made, on behalf of themselves and the Vessel, the Buyers agree that they are in possession of the Marine Fuels solely as Bailee for the Sellers. If, prior to payment, the Sellers' Marine Fuels are commingled with other marine fuels on board the Vessel, title to the Marine Fuels shall remain with the Sellers corresponding to the quantity of the Marine Fuels delivered. The above is without prejudice to such other rights as the Sellers may have under the laws of the governing jurisdiction against the Buyers or the Vessel in the event of non-payment.

## 11. Termination

Without prejudice to accrued rights hereunder, the Seller shall be entitled to terminate this Contract in the event of:

a) any application being made or any proceedings being commenced, or any order or judgement being given by any court, for

  i) the liquidation, winding up, bankruptcy, insolvency, dissolution, administration or re-organisation or similar, or

  ii) the appointment of a receiver, liquidator, trustee, administrator, administrative receiver or similar functionary of the Buyer of all or a substantial part of its assets (otherwise than for the purpose of a reconstruction or amalgamation);

b) the Buyer or any of its affiliates failing to pay its debts as they become due or suspending payment of its financial obligations, ceasing to carry on business, or compounding or making any special arrangement with its creditors, or;

c) any act being done or event occurring which, under the applicable law thereof, has a substantially similar effect to any of the said acts or events described above.

## 12. Indemnity

a) Without prejudice to any other claims arising hereunder or in connection herewith and notwithstanding the provisions of sub-clause 9(d), if loss is suffered or a liability is incurred by either party hereto as a direct result of compliance with directions given by the other party, during or for the purposes of the parties' obligations hereunder, then the injured party is to be indemnified by the other in respect of such loss or liability.

b) Where claims arise under sub-clause 9(c) and subclause 12(a), compensation payable in accordance with sub-clause 9(c) shall be taken into account in assessing sums payable under sub-clause 12(a).

c) Seller and Buyer recognize the risks inherent in ship to ship operations and that the decision to proceed with such operations is in the sound discretion of the Masters of the vessels involved. It therefore is agreed that:

  i) Buyer assumes all liability for any loss or damage to Buyer's Vessel or injury to the crew thereon caused by any condition of the Bunker Tanker or any fault of the Master or crew of the Bunker Tanker and Buyer shall indemnify and defend Seller against all such liability.

  ii) Seller assumes all liability for any loss or damage to the Bunker Tanker or injury to the crew thereon caused by any condition of Buyer's Vessel or any fault of the Master or crew of Buyer's Vessel and Seller shall indemnify and defend Buyer against all such liability.

## 13. Force Majeure

Neither party hereto shall be responsible for any loss, damage, delay or failure in performance under this Contract resulting from an act of God, or the port or area of delivery being affected by war, civil commotion, riot, quarantine, strike, stoppage, lock-out, arrest, restraint of princes, rulers and people, piracy, acts of terrorism or any other event whatsoever which is beyond the control of Seller and cannot be avoided or guarded against by the exercise of ordinary care.

## 14. Safety and the Environment

a) In the event of any spillage (which for the purpose of this Clause shall mean any leakage, escape, spillage or overflow of the Marine Fuels) causing or likely to cause pollution occurring at any stage of the bunkering operation, the Buyers and the Sellers shall jointly, and regardless as to whether the Buyers or the Sellers are responsible, immediately take such actions as are reasonably necessary to effect clean up and which shall always be conducted in accordance with such local laws and regulations which may compulsorily apply.

b) Where it is a compulsory requirement of the law of the port or place of delivery of the Marine Fuels that the Sellers shall have in place their own oil spill contingency plans, the Sellers shall ensure that valid oil spill contingency plans approved by the relevant authorities are in effect to the extent that is so required.

c) The Sellers hereby guarantee payment of and/or agree to indemnify and hold the Buyers harmless for any claims, losses, damages, expenses, penalties or other liabilities incurred by the Buyers under the United States



Monjasa Group
Strevelinsvej 34
DK-7000 Fredericia
www.monjasa.com

Tel: +45 70 260 230
Fax: +45 70 230 233
denmark@monjasa.com

Page 4 of 5


Oil Pollution Act of 1990, or other state, national or international oil pollution legislation, as a result of any spillage occurring whilst the Marine Fuels are being transported directly or indirectly to or from the Vessel's bunker manifold except to the extent that such spillage is caused by any fault on the part of the Buyers. The Buyers shall similarly indemnify the Sellers where any such spillage occurs once risk in the Marine Fuels has passed to the Buyers.

d) The Sellers shall use their best endeavours to ensure that the bunker supplying company is fully insured for oil spill liabilities as required by statutory rules or regulations. Proof and conditions of such coverage, established by the bunker supplying company shall be made available to the Buyers at their request, as soon as practically possible.

e) The Buyers hereby advise the Sellers that they enforce a company drug and alcohol policy on board their vessels, whereby the Sellers' personnel must not be intoxicated at any time on board. It is understood and agreed that the selling, possession, distribution, use or being under the influence of any controlled substance or dangerous drugs other than those medically prescribed is prohibited.

f) The Sellers hereby advise the Buyers that they enforce a company drug and alcohol policy in their facilities and on board their vessels, which the Buyers' personnel must comply with while in such facilities or on board such vessels. It is understood and agreed that the selling, possession, distribution, use or being under the influence of alcohol or any controlled substance or dangerous drugs other than those medically prescribed is prohibited.

### 15. Severability

If any provision of this Contract shall be held invalid, the invalidity does not affect other provisions of this Contract which can be given effect without the invalid provision, and to this end the provisions of this Contract are severable.

### 16. Dispute Resolution

This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced. The arbitrators shall be commercial men and/or familiar with shipping matters.

This agreement to arbitrate is without prejudice to Seller's right to use any and all legal process to obtain security for its claims in the United States and/or anywhere in the world pending resolution of the merits of its claim in arbitration.

*These General Terms and Conditions shall remain applicable to any transaction between the Seller and the Buyer - including their fleet of vessels whether disponed, managed, chartered or owned.*



Monjasa Group
Strevelinsvej 34
DK-7000 Fredericia
www.monjasa.com

Tel: +45 70 260 230
Fax: +45 70 230 233
denmark@monjasa.com

Page 5 of 5



# MONJASA
Bunkering knowledge

| | |
|---|---|
| | **INVOICE #**     AE27825 |

M/V OCEAN TOMO and/or master and/or
owners and/or charterers and/or
managers and/or operators and/or
Egyptian Bulk Carriers Co
15, El Nasr Avenue
Ramo Building; Nasr City
Cairo
Egypt

Invoice Date    27-11-2013
**Delivery Date**    **23-11-2013**
Your Ref    Hany Habib

We hereby debit you concerning OCEAN TOMO, delivered at Gibraltar as follows:

| Product Description | Quantity | Unit | Price/Unit | Total |
|---|---|---|---|---|
| Ifo-380cst RMG380 3,5% | 605,0260 | Mts.fob | 625,00 | 378.141,25 |
| MGO DMA 0,1% | 22,0190 | Mts.fob | 980,00 | 21.578,62 |

| Total amount due in USD (Free of VAT) | 399.719,87 |
|---|---|

Remark:
Bunker Receipt(s) enclosed.

**PAYMENT MUST BE RECEIVED IN FULL BEFORE OR ON DUE DATE AND
WITHOUT ANY DEDUCTIONS. ALL BANK CHARGES ARE FOR BUYER'S ACCOUNT.**

**Payment should be instructed from you no later than: 21-12-2013**

For late payment, a monthly interest of 2% per month will apply.
The interest will be calculated for each overdue day.

Please pay to:
| | | | |
|---|---|---|---|
| Beneficiary | Monjasa DMCC | S.W.I.F.T | SYBKDK22 |
| Reference | Invoice no. AE27825 | IBAN | DK6580720009412751 |
| Bank | Sydbank | Bank slip to fax | 74 37 35 20 |

Please scan a copy of your bank slip and email it to accountsuae@monjasa.com or fax it to +971 4 432 8637

In case of questions, you are welcome to contact our accounts department on phone +971 4 420 8600

Monjasa DMCC
Jumeirah Lake Tower, AG Tower, Office No 35 JKL
Dubai, UAE

Phone :    +971 4 420 8600
Fax :    +971 4 432 8637
Email :    dubai@monjasa.com



# BALANCE

Egyptian Bulk Carriers Co
15, El Nasr Avenue
Ramo Building; Nasr City
- Cairo
Cairo
Egypt

Issue date: 12-06-2014
Monthly rate: Interest 2%

Please find here below the updated statement of balance.

| Duedate | Invoice | Ship | Amount | Currency | Overdue days | Remaining amount | | Interest |
|---|---|---|---|---|---|---|---|---|
| 23-12-13 | AE27825 | OCEAN TOMO | 399.719,87 | USD | 171 | 399.719,87 | | 45.568,07 |
| | | | | Total | | 399.719,87 | Interest | 45.568,07 |
| | | | | | | Total balance | | 445.287,94 |

Please remit the outstanding balance and forward bank slip for us to trace the funds.

Thanks in advance.

**Monjasa DMCC**
Accounts department

| | | |
|---|---|---|
| Monjasa DMCC | Telefon | +971 4 420 8600 |
| Jumeirah Lake Tower | Fax | +971 4 432 8637 |
| AE  Dubai    Reg. no. 30528 | Email | dubai@monjasa.com |